**CSD 3000C** [07/01/18]
Name, Address, Telephone No. & I.D. No.
Ahren A. Tiller, Esq. (SBN: 250608)
Bankruptcy Law Center, APC
1230 Columbia St., Ste. 1100
San Diego, CA 92101
(619) 894-8831
(866) 444-7026

**Order Entered on**
January 13, 2021
**by Clerk U.S. Bankruptcy Court**
**Southern District of California**

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

| In Re<br>Seth Koeut | **LODGED** |
|---|---|
| Debtor. | BANKRUPTCY NO.  12-07242-MM7 |
| Seth Koeut<br><br>Plaintiff(s) | ADVERSARY NO.  18-90130-MM |
| v.<br>U.S. Department of Education; Great Lakes Educational Loan Services, Inc.; and Does 1-10<br>Defendant(s) | Date of Hearing:  October 27, 2020<br>Time of Hearing:  9:30 am<br>Name of Judge:  Hon. Margaret M. Mann |

## JUDGMENT

The court orders as set forth on the continuation pages attached and numbered __2__ through __2__ with

exhibits, if any, for a total of __21__ pages.  Notice of Lodgment Docket Entry No. __60__ .

//

//

//

//


DATED:    January 13, 2021

Judge, United States Bankruptcy Court

**CSD 3000C**

**CSD 3000C** [07/01/18]**(Page 2)**
ORDER ON JUDGMENT
DEBTOR: Seth Koeut

CASE NO.: 12-07242-MM7
ADV. NO.:  18-90130-MM

This matter having come before this Court for Trial on October 27, 2020, based upon this Court's findings of fact and conclusions of law and reasoning set forth in the attached Memorandum Decision dated December 4, 2020, entered on the docket as ECF No. 57, which is attached to this Judgment and marked for identification purposes as "Exhibit 1,"

JUDGMENT IS ENTERED AS FOLLOWS:

Plaintifff / Debtor, Seth Koeut ("Plaintiff") is granted a Partial Discharge of $432,173.99 of Plaintiff's Student Loans owed to Defendant, Department of Education ("DOE"), leaving a balance of $8,291.67, with interest to accrue at 0.11%.

Plaintiff is only required to make payments of $41.87 per month to the DOE commencing December 2031 until December 2048.

IT IS FURTHER ORDERED, ADJUDGED and DECREED THAT PURSUANT TO FED R. BANKR. P. 9021, THIS CONSTUTES A FINAL JUDGMENT.

IT IS SO ORDERED.

**CSD 3000C**

*Seth Koeut v. U.S. Dept of Education; Great Lakes Educational Loan Services, Inc; and DOES 1-10.*

*Adv. No. 18-90130-MM*

# EXHIBIT 1

**WRITTEN DECISION – FOR PUBLICATION**

ENTERED 12/4/20

FILED

DEC – 4 2020

CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | BANKRUPTCY NO: 12-07242-MM7 |
| SETH KOEUT, | CHAPTER: 7 |
| Debtor, | MEMORANDUM DECISION |
| | |
| SETH KOEUT, | Adv. Proc. 18-90130-MM |
| Plaintiff, | DATE: October 27, 2020 |
| | TIME: 9:30 a.m. |
| v. | CRTRM: One |
| U.S. DEPARTMENT OF EDUCATION; GREAT LAKES EDUCATIONAL LOAN SERVICES, INC.; and DOES 1-10, | JUDGE:    Margaret M. Mann |
| Defendants. | |

1

## I.  **INTRODUCTION**

Debtor Seth Koeut ("Koeut") filed bankruptcy and sought to discharge $440,000 in student loans[1] under 11 U.S.C. § 523(a)(8)[2] claiming repayment would cause him an undue hardship. Koeut was born to Cambodian refugee parents who immigrated to this country when he was a child. He and his family lived in extreme poverty, collecting cans from the trash to supplement the family income. He overcame these limitations due to his intelligence and hard work. Koeut received a quality education at Duke University and medical school financed by student loans. Koeut passed his board examinations and was on his way to success as an American physician.

Then bad luck intervened. Despite Koeut's persistent efforts, he failed to secure a residency placement, which dashed his hopes to become a licensed physician in this country. The mysterious workings of the algorithm that matches students with residency positions, rather than fault attributable to Koeut, caused this problem. The residency mismatch then precipitated a cascade of deteriorating employment prospects for Koeut. In the ten years since medical school, Koeut was forced to abandon hope of employment as a physician. He has also been unable to find employment in any medical profession. Instead, Koeut has taken menial jobs to survive.

The Department of Education ("DOE") and Koeut concur that he could improve his employment situation over time. The dispute is over what is standing in his way. Koeut claims his low credit score from the size of his student loans, coupled with the now ten-year period of underemployment, will prevent any improvement unless his student loans are discharged. The DOE contends Koeut has not given his best effort to find better employment. It also contends Koeut must accept the Income Based Repayment Plan ("IBR") offered by the DOE to be found in good faith.

---

[1] This total is based on $328,909.02 in principal with accrued interest of $111,556.64 for total amount due of $440,465.66 as of August 27, 2020.

[2] All statutory section references are to Title 11, United States Code, unless otherwise noted.

Student loan disputes are inherently factual and the court assessed the credibility of the evidence at trial.[3] The court finds Koeut has given his best effort to maximize his earning potential to date, but will not achieve his maximum salary, if at all, without a partial discharge of nearly all his student loans. Koeut will also need ten years of additional experience and retraining before this can occur. The court also finds that Koeut's reasons for rejecting the IBR are sound since he justifiably believes an IBR will continue to depress his credit score and hinder his employment opportunities and financial stability. Even if Koeut eventually maximizes his potential, his salary will still be insufficient to enable him to make any more than minimal payments on his student loans. Since Koeut cannot in good faith be expected to pay more than he will ever afford without suffering an undue hardship, the student loan balance he cannot pay will be discharged and he will be required to pay the rest.

This opinion contains the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## II.   **FINDINGS OF FACT**

### A. Personal Background

Koeut was born on July 29, 1980 in a Cambodian refugee camp in Thailand. He is now a U.S. citizen. He was married in December 2004, divorced in April 2012, and has no children. Koeut does not suffer from any physical or mental health problems that would affect his employment prospects. He has 27 years remaining of his working life. The court observed Koeut to be an articulate, rational, intelligent, and credible individual.

### B. Bankruptcy

Koeut filed chapter 7 bankruptcy on May 21, 2012 and received his discharge soon thereafter. He filed two actions to discharge his student loans; one in pro per in 2015 which he dismissed, and this adversary proceeding in 2018.

---

[3] The court considered all the testimony and exhibits. It appreciates the parties' efforts in stipulating to many facts.

3

1    When Koeut filed bankruptcy, his only significant asset was a Scion iQ with a net

2  value after deducting the car loan of $16,000. He reaffirmed the loan but then lost the

3  car to repossession when he was unable to continue making payments. Koeut has

4  since acquired a 2013 Ford Focus valued at $3,700. Koeut's current assets (including

5  personal property, cash, and bank accounts) have an aggregate value of less than

6  $5,000.

7    C. Education and Skills

8    Koeut worked hard at his education with great success. Koeut ranked 6th in his

9  high school graduating class. Koeut obtained a Bachelor of Science degree in Marine

10  Biology and a Bachelor of Art degree in Spanish from Duke University in 2002. After

11  graduating, Koeut moved to Bangkok, Thailand, to study clinical tropical medicine at

12  Mahidol University. He completed his coursework in March 2003 but did not earn a

13  formal degree. Koeut attended the Ponce School of Medicine in Puerto Rico from 2006

14  to 2010 and passed all the medical board examinations.

15    Koeut is a polyglot. He is fluent or proficient in speaking English, Cambodian,

16  Spanish, French, and Italian, but can read and write in only English and Spanish.

17    While in his last year of medical school, Koeut applied for his first residency

18  program using the mandated matching system which uses an algorithm. Koeut's

19  undisputed understanding is that this system matches 99.9% of the applicants with a

20  residency program. Although Koeut diligently applied to various residency programs for

21  five years, the algorithm failed to work for him. Completion of a residency program is a

22  prerequisite to being licensed as a physician.

23    This quality education was expensive. With his limited means, both college and

24  medical school were financed with student loans from the DOE. Koeut made several

25  small payments towards his student loans between 2003 and 2005. He consolidated the

26  student loans at the time he left medical school and entered into an IBR.[4] Koeut then

27  ─────────────────────────
[4] While Koeut testified he deferred his student loans from October 2010 to October 2015,
28  Cristin Bulman ("Bulman"), a loan analyst for the DOE, credibly testified that Koeut was
required to select a repayment plan to consolidate his loans. She contended Koeut
selected an IBR with a monthly payment of $0 which started in October 2010. The court

made one payment on his student loans. While continuously applying both to residency programs and jobs, Koeut's low income and inability to make payments qualified him for multiple deferments of the student loans from 2010 through 2015. These deferments kept Koeut's student loans from going into default.

Koeut stopped complying with his reporting requirements to the DOE under his IBR in 2015, when he filed his first adversary proceeding to discharge his student loans. Collection efforts then began.

D. Employment History and Prospects

Koeut's employment history has run the gamut of temporary low paying jobs. Before medical school, Koeut's part-time employment included a position as an instructor with the Birch Aquarium, a job as a barista at Starbucks, and a job as a sales associate at Saks Fifth Avenue. After medical school, with periods of unemployment, Koeut worked as a sales associate at Bloomingdales and at Crate & Barrel, a sales clerk at Banana Republic, a call center agent for Luth Research, a customer service agent for TriStaff Group, an agent with BaronHR answering service, a parking lot signaler at the Del Mar Fair, a canvassing director for political campaigns, a restaurant host, and recently as a dishwasher in a Mexican restaurant.

Since 2010, Koeut's total annual income from all sources (including unemployment benefits) has ranged from a low of $3,026 in 2010 to a high of $31,473 in 2017. Because of Koeut's low income, had he continued his participation in the IBR, his month student loan payments would have been $0 in 2016, $167.29 in 2017, $11.36 in 2018, and $48.48 in 2019.

Koeut and vocational evaluation expert Mark Remas, MA, CRC, ABVE ("Remas") explained why each believed Koeut has not been more successful in maximizing his employment. Remas was not called as a witness, so his testimony was limited to his opinions contained in his initial and updated reports dated May 26, 2016

---

infers Koeut understood this to be a deferment and it is immaterial if that understanding was technically incorrect.

5

1    and April 22, 2019. Remas opined Koeut can optimally achieve a three-stage career

2    and salary trajectory in professional positions "such as pharmaceutical sales, insurance

3    adjuster, medical device sales, clinical research associate, and healthcare

4    administration, among others." Remas conceded that Koeut no longer has prospects as

5    a doctor and cannot work as a Physician's Assistant. Remas's opinion is that initially,

6    during retraining and job searches, Koeut at his current employment will earn $12 to

7    $15 per hour. After tenure with an employer for three to five years, Koeut can earn

8    $45,000 to $55,000 annually. After gaining experience within seven to ten years Koeut

9    can earn $55,000 to $75,000 per year.

10         Remas's first report also identified certain job opportunities thought to be

11    available to Koeut to start him on this trajectory. Although the DOE argued that Koeut

12    was uninterested in pursuing these leads, Koeut credibly rebutted this claim testifying

13    that he had pursued these opportunities without success. Koeut stressed he applied to

14    5,000 jobs since graduating from medical school in nearly every conceivable field,

15    including 1,000 jobs with UCSD. He documented 500 pages of these applications to

16    Remas. Koeut applied for jobs in the medical field, including as a clinical advisor to

17    Modern Alkame, and in sales positions for medical devices or pharmaceutical sales. He

18    networked with a friend to obtain a job with Quintiles, a potential employer in the

19    medical field.

20         To make use of his language skills, he applied for jobs as a translator to no avail.

21    He applied to the Foreign Service and the World Health Organization. He applied to

22    office supply jobs. Koeut considered applying for a job as an insurance adjuster but

23    chose not to since it paid less than his salary at the time. This was the only job Remas

24    suggested that Koeut did not pursue. In 2016, Koeut refocused his efforts on non-

25    medical fields recommended by Remas because of Koeut's retail sales experience.

26    Koeut estimated that he applied to 150-300 of such jobs and gave examples. But these

27    employment prospects required business to business sales experience that Koeut

28

6

lacks. Koeut was unsuccessful in all of these applications, often not even receiving a response.

Koeut did not only submit applications online as the DOE contends. Instead, he hired a recruiter who advised him his medical degree was a deterrent. Koeut posted his resume online with CareerBuilding, BingAmajob.com, LinkedIn, Monster, Indeed, and other publicly available job sites. To improve his job prospects, Koeut secured unpaid positions with Duke University, the Bali Indonesia HIV Aids clinic project, and as a UCSD Department of Surgery research assistant. He also networked with alumna, friends, and colleagues.

To establish Koeut is not trying hard enough, the DOE focuses on Remas's opinion that Koeut has "adapt[ed] to being a marginal worker" because "he is not motivated and does not have the initiative to engage in professional work and develop a substantial career." This testimony cannot be taken out of context, however. A medical school graduate who works as a parking attendant and dishwasher cannot be described as lazy. Remas also recognizes that Koeut "would like to advance into more financially rewarding work," and that advancement is more likely if Koeut's "debt obligation is reduced." Koeut explained at trial that he met with Remas in connection with the second report when he was feeling defeated because he had lost what he had hoped would be employment in the political canvassing field and had been unemployed for six months.

The only credible explanation for Koeut's declining employment prospects since medical school is the Catch 22 that Koeut offered; he is simultaneously overqualified and underqualified for higher paying jobs that might otherwise be available to him. He was overqualified for jobs in the medical field due to his degree but lacked experience in other fields. This problem exacerbated over time. That Koeut has suffered from declining prospects is most vividly demonstrated by the approximately 25% decline[5] in Remas's opinion of Koeut's maximum salary over the three-year period between his reports. Remas cited to statistics showing that the longer someone is unemployed, the

---

[5] Specifically, from $117,691 in Remas's initial report to $75,000 in his updated report.

7

less employable that person becomes due to depreciating job skills. Remas recognizes that maximum employment could require further education and delays, and that Koeut should be provided financial assistance to overcome these challenges. Remas did not explain how this assistance would be provided.

E. Maximum Achievable Salary Prospects

Although Remas adopted a range of possible salary outcomes, the court concludes the conservative end of Remas's range, and the later timing prediction of when the increased salary can be achieved, is more likely for several reasons. First, Koeut needs to save the funds for retraining which he currently lacks. Second, Koeut's long period of underemployment depresses salary potential. Remas cited to data showing that "after one calendar year of long-term unemployment an individual's return-to-work wages were 14% lower than previously earned and by five years their wages were 30% lower." The court accordingly finds that Koeut's maximum salary potential is at the low end of Remas's updated range, or $55,000 which he will only achieve ten years from now.

F. Reasonable Expenses

To determine what portion of his student loans Koeut can pay without undue hardship, reasonable expenses must be deducted from the maximum gross income he can achieve. While the undue hardship test is strict, it does not require that debtors live at or below the poverty line to obtain relief under § 523(a)(8). *Educ. Credit Mgmt. Corp. v. Howe (In re Howe)*, 319 B.R. 886, 889 (B.A.P. 9th Cir. 2005) (the IRS standards and also the debtor's actual expenses must be considered to determine whether the undue hardship test is met). In fact, cable television, tanning and a new car were affirmed as part of the minimal standard of living in *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088 (9th Cir. 2001), and retirement contributions may also be included in this standard. *See Craig v. Educ. Credit Mgmt. Corp. (In re Craig)*, 579 F.3d 1040, 1046-47 (9th Cir. 2009).

8

Here, reasonable expenses must be determined in two time periods; the current period and in ten years when Koeut might achieve his maximum salary of $55,000 per year. The evidence presented by Koeut regarding his current expenses was undisputed. These expenses total $3,268 and include: taxes deducted from wages of $462; rent of $1,350; health insurance of $296; prescription costs of $8; auto insurance of $117; cellular phone of $30; average utilities of $105; gas and auto maintenance of $300; clothing of $100; and personal care and food of $500. Koeut is frugal, even living in his parents' kitchen for many years to save rent. Despite Koeut's minimization of his expenses to match his low salary, this leaves a deficit at his current salary.

Determining what Koeut's net income will be ten years from now is a challenging task. "We recognize that courts have found it difficult to predict future income." *Educ. Credit Mgmt. Corp. v. Nys (In re Nys)*, 446 F.3d 938, 945 (9th Cir. 2006). The court concludes that the IRS Standards for reasonable expenses used in the means test of § 707(b) is the best predictor of Koeut's future expenses. *Howe*, 319 B.R. at 889. In ten years, while Koeut will potentially be earning more income, some of Koeut's expenses will also likely be higher than they are currently. According to Remas, Koeut needs to save for retraining expenses. Remas also opined that Koeut needs reliable transportation to maximize his employment. Because Koeut's current car would be 17 years old in ten years, Koeut will likely need a new car. His current expenses do not include the car ownership cost of $521 included under the IRS Standards. Koeut's rent is currently 50% below the IRS Standards which is not sustainable for ten years. At the same time, Koeut's current clothing budget is high and he will need to economize to live within the IRS Standards which are contained in the chart below.

| Expenses in 10 Years Per IRS Standards | |
|---|---|
| Housing & Utilities | $1,851.00 |
| Car – Ownership | $521.00 |
| Car - Operating Expenses | $230.00 |
| Out-of-Pocket Health Care | $56.00 |
| Health Insurance | $350.00 |
| Personal Care & Food | $428.00 |

9

| Clothing | $85.00 |
|---|---|
| **Total Expenses** | **$3,521.00** |

To determine the net income that Koeut would have available at the projected higher income in ten years, his increased tax burden must also be considered. The court determined Koeut's projected net paycheck by taking judicial notice of the tax calculation guides found on the taxing agencies' websites[6].

| Koeut's Net Pay Based on $55,000 Gross Income | |
|---|---|
| **Monthly Gross Pay** | **$4,583.33**<br><br>$55,000 ÷ 12 = $4,583.33 |
| **Federal Tax** | **$430.67** |
| **FICA (Social Security & Medicare)** | **$350.63**<br><br>Social Security: $55,000 x 6.2% = $3,410 ÷ 12 = $284.17<br><br>Medicare: $55,000 x 1.45% = $797.50 ÷ 12 = $66.46 |
| **California State Tax** | **$193.33**<br><br>$2,320 ÷ 12 = $193.33 |
| **SDI** | **$45.83**<br><br>$55,000 x 1% = $550 ÷ 12 = $45.83 |
| **Average Monthly Net Pay** | **$3,562.87** |

---

[6] The parties conceded judicial notice of the IRS standards and the following taxing agencies' websites was appropriate:

*Tax Withholding Estimator*, IRS (Nov. 9, 2020), https://www.irs.gov/individuals/tax-withholding-estimator;

*Topic No. 751 Social Security and Medicare Withholding Rates*, IRS (Oct. 22, 2020), https://www.irs.gov/taxtopics/tc751;

*Tax calculator, tables, rates,* State of California Franchise Tax Board (Aug. 24, 2020), https://www.ftb.ca.gov/file/personal/tax-calculator-tables-rates.asp; and

*What are State Payroll Taxes?*, State of California Employment Development Department, https://edd.ca.gov/Payroll_Taxes/What_Are_State_Payroll_Taxes.htm, (last visited Nov. 20, 2020).

This analysis reflects that after taking the tax burden into account at a projected $55,000 gross income level, Koeut would have a net paycheck of $3,562.87. Deducting reasonable expenses of $3,521 from that amount leaves $41.87 available to make payments on his student loans.

III.  **CONCLUSIONS OF LAW**

    A. Jurisdiction

        The court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b) and constitutional authority to enter a final judgment in this action. *Deitz v. Ford (In re Deitz)*, 760 F.3d 1038, 1039 (9th Cir. 2014). This dischargeability matter was identified as statutorily core, and the parties also implicitly consented to the court's final adjudication of it. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1942 (2015) ("Our precedents make clear that litigants may validly consent to adjudication by bankruptcy courts.")

    B. Legal Standard

        Under § 523(a)(8), Koeut's student loans may be discharged in full, in part, or not at all, based upon the extent to which the court finds the repayment of these loans would constitute an undue hardship. *Craig*, 579 F.3d at 1045-46. Both Koeut and the DOE concede the court has authority to enter a partial discharge pursuant to its equitable authority under § 105(a). *Saxman v. Educ. Credit Mgmt. BJR Corp. (In re Saxman)*, 325 F.3d 1168, 1174 (9th Cir. 2003) (holding that a debtor is entitled to a discharge of that portion of the student loan that meets the requirements of § 523(a)(8)); *Educ. Credit. Mgmt. Corp. v. Jorgensen (In re Jorgensen)*, 479 B.R. 79, 86 (B.A.P 9th Cir. 2012) (applying each element of the *Brunner* test to the partial discharge analysis).

        The Ninth Circuit in *United Student Aid Funds v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir. 1998), adopted the three part test ("*Brunner* test") for determining undue hardship articulated in *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395, 396 (2nd Cir. 1987):

1    (a) the debtor cannot maintain, based on current income and expenses, a

2    "minimal" standard of living for himself and his dependents if forced to repay the loans;

3    (b) additional circumstances exist indicating that this state of affairs is likely to

4    persist for a significant portion of the repayment period of the student loans; and

5    (c) the debtor has made good faith efforts to repay the loans.

6    Each factor is addressed below.

7        i.   Current Income and Expenses

8    The first element of the *Brunner* test is a mechanical one, requiring the court to

9    determine Koeut's current income and expenses. *Nys*, 446 F.3d at 941 (first element

10    refers to "inability to pay now" and current income and expenses to determine undue

11    hardship). Koeut's actual expenses are determinative of his current inability to make

12    payments in the first prong of the *Brunner* test. *Higher Educ. Assistance Agency v.*

13    *Birrane (In re Birrane)*, 287 B.R. 490, 496 (B.A.P. 9th Cir. 2002) (reasonable current

14    expenses of debtor are relevant to first prong of test).

15    The DOE does not dispute that Koeut cannot meet his current expenses with his

16    current pay. Instead it argues that Koeut should increase his current income. This

17    argument is inconsistent with *Nys*, 446 F.3d at 944, which does not consider future

18    income and expenses, which only relate to the remaining two prongs of the *Brunner*

19    test. Since there is no factual dispute that Koeut's "current income and expenses" leave

20    him without an ability to pay the loans now, the first prong of the *Brunner* test is met.

21        ii.   Persistence of Problem

22    The second prong of the *Brunner* test requires the court to determine whether

23    additional circumstances exist indicating that Koeut's current impoverished state of

24    affairs is likely to persist for a significant portion of the repayment period of the student

25    loans. The DOE also points to the lack of evidence that Koeut has "psychiatric

26    problems, lack of usable job skills and severely limited education" as found in *Birrane*,

27    287 B.R. at 497, to argue that Koeut cannot meet this second prong. But the Ninth

28    Circuit does not require "that additional circumstances be 'exceptional' in the sense that

12

the debtor must prove a 'serious illness, psychiatric problems, disability of a dependent, or *something* which makes the debtor's circumstances more compelling than that of an ordinary person in debt.'" *Nys*, 446 F.3d at 946. Instead, the *Brunner* test requires nothing more than an inability to pay the student loans currently and in the future. *Id.* Koeut may only be an ordinary person with an overload of student debt hindering his earning capacity due to a paucity of luck, but that is not fatal to the second prong of the test.

The Ninth Circuit instead looks to myriad factors to determine the debtor's ability to make student loan payments in the future: (1) whether the debtor or a dependent has a serious mental or physical disability which prevents employment or advancement; (2) the debtor's obligation to care for dependents; (3) a lack of, or severely limited, education; (4) poor quality of education; (5) lack of marketable job skills; (6) underemployment; (7) maximized income potential in the chosen field and no other more lucrative job skills; (8) limited number of work years remaining; (9) age or other factors that prevent retraining or relocation; (10) lack of assets which could be used to pay the loans; (11) potentially increasing expenses; and (12) lack of better financial options elsewhere. *Id.* at 947.

Some of these factors do not support a discharge of the loans. Koeut has no disabilities or children. Factors 1 and 2. Koeut also has an extensive quality education. Factors 3 and 4. The remaining factors strongly support a partial discharge of the student loans, however, due to his current poverty and the employment impediments that will cause the problem to persist.

First, it is undisputed Koeut has no additional assets that he can use to repay the loans. Factor 10. While Koeut has 27 years of his working life remaining, he needs retraining to achieve a higher income that he currently lacks the resources to fund. Factor 8. Unlike in *Birrane*, 287 B.R. at 500 and *Educ. Credit Mgmt. Corp. v. Mason (In re Mason)*, 464 F.3d 878, 885 (9th Cir. 2006), where the debtors had not pursued full-time employment in a field beneath their chosen fields, Koeut has pursued and

13

1   accepted whatever employment he could arrange, including dishwashing and parking

2   attendant jobs. Factor 7 thus supports a partial discharge.

3   　　　As to Factor 9, through no fault of his own, Koeut has suffered from

4   underemployment for ten years. Even with retraining that he must find a way to pay for,

5   his maximum income would be $55,000 per year. Factors 6, 7, and 12. The court is not

6   condoning Koeut "purposely choosing to live a lifestyle that prevents [him] from

7   repaying [his] student loans" as in *Nys*, 446 F.3d at 946 and *Rifino*, 245 F.3d at 1089.

8   Instead, the court is requiring Koeut to pursue these other opportunities, simply with a

9   debt load that enhances his chances of success. By using the reasonable expenses in

10   the IRS Standards, Koeut still lacks sufficient income to make more than minimal

11   monthly payments of $41.87 on his student loans.

12   　　　In weighing these factors, the court finds that Koeut's conditions will persist and

13   he will never earn sufficient income to fully repay his student loans. A partial discharge

14   is thus in order even though Koeut's "earning capacity is expected to improve. . .

15   [because] that improvement will be insufficient for the debtor to pay the full balance due

16   without an undue hardship." *Carnduff v. United States Dep't of Educ. (In re Carnduff)*,

17   367 B.R. 120, 133 (B.A.P. 9th Cir. 2007) (recommending a methodology of projecting

18   debtors' "future income, deduct future expenses, calculate how much student loan debt

19   Debtors could pay without undue hardship, and discharge the excess"). This

20   methodology may result in a partial discharge of the loans. *Mason*, 464 F.3d at 884.

21   　　　After another ten years of work experience, Koeut may be able to earn $55,000

22   per year for another 17 years. After deducting taxes and reasonable expenses, Koeut is

23   left with only a net income of $41.87 per month. The present value of a stream of

24   payments for 17 years at the federal judgment rate of 0.11% is $8,291.67. This is all

25   Koeut can afford to pay on his student loans so the balance will be discharged in

26   accordance with the second prong of the *Brunner* test.

27

28

iii.    Good Faith

The third prong of the *Brunner* test is good faith. "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses." *Birrane*, 287 B.R. at 499. The court will require Koeut in good faith to obtain employment at a maximum income level which Remas reasonably predicts he can achieve and make the payments on his student loans he can afford after deduction of taxes and reasonable expenses.

The DOE also contends that Koeut did not act in good faith because he abandoned his IBR. The IBR would reduce Koeut's monthly payments to no more than 15% of the amount by which his monthly adjusted gross income exceeds 150% of the poverty line. Koeut is also eligible for the REPAYE option under 34 C.F.R. § 685.208 to further reduce his payments to 10% of the difference between a borrower's monthly adjusted gross income and 150% of the applicable poverty line, divided by 12. *See* 34 C.F.R. § 685.208(k)(3) and § 685.209(c)(1). Under either option, Koeut would remain liable on the full amount of his student loans for 25 years, after which the unpaid balance would be forgiven.

Koeut had good reasons to reject the IBR in lieu of pursuing a discharge in bankruptcy, however. By delaying the forgiveness of the balance owed for 25 years, an IBR negatively impacts the debtor's credit score and can create forgiveness of indebtedness tax problems in the future. *Roth*, 490 B.R. at 917 ("Any offered repayment plan's terms, duration, and consequences need to be examined. These consequences include future tax liability[7] and negative credit ratings."); *Carnduff*, 367 B.R. at 136.

---

[7] Although Koeut did not raise the negative consequence of cancellation of indebtedness income after 25 years had he accepted the IBR, this can also be justification for rejecting an IBR. At this time, given Koeut has no retirement savings and has budgeted for none, he would have no income to pay what could be a substantial amount of cancellation of indebtedness income. 26 U. S.C. § 108(b); *Williams v. Educ. Credit Mgmt. Corp. (In re Williams)*, 301 B.R. 62, 79 (Bankr. N.D. Cal. 2003) (discharging debt despite rejection of an IBR that "under the current state of the law, Debtors' calculations are that they will be charged with taxable income of $ 300,000 to $ 400,000 on the eve of their 80th birthdays.")

1    Koeut is justifiably concerned that the size of his student loans deprived him of

2  job opportunities because it reduced his credit score. Jordan Bartley Mack, Comment,

3  *Born In The Red: How Affirmative Action Could Cure The Race-Credit* Divide, 55 Hous.

4  L. Rev. 1157, 1165-66, n. 47 (2018) ("about half of employers look at credit reports as

5  part of the hiring process" and a "low credit score can be very costly, the effects of

6  which can ripple outwards dramatically, determining what jobs people can get, what

7  apartments they can rent, and what price they pay for their cell phone plans and car

8  insurance.") Employers in this state may use a consumer credit report for hiring

9  decisions for financial institutions, managerial positions, and those involving access to

10  certain personal, confidential, or proprietary information. Cal. Lab. Code § 1024.5.

11  Koeut believes[8] he was recently rejected for a full-time position at Greendot, an

12  employer he had worked for through the staffing agency, TriStaff, because of his poor

13  credit score. Koeut testified the Greendot position involved access to confidential

14  information.

15    Koeut believed a discharge would alleviate this problem since it would reduce the

16  outstanding balance, $328,909.02 of his student loans, and in turn improve his credit

17  score. Koeut said he reviews his credit score regularly and is advised of what factors

18  are affecting his credit score. This testimony is credible since the Fair Credit Reporting

19  Act ("FCRA"), 15 U.S.C. § 1681 *et. seq.*, requires Koeut be advised of the top four "key

20  factors that adversely affected the credit score of the consumer" on request. 15 U.S.C.

21  § 1681g(f)(1)(C). These factors must be "listed in the order of their importance based on

22  their effect on the credit score." 15 U.S.C. § 1681g(f)(2)(B). Bulman, who is a DOE

23  employee testified that the outstanding principal balance of the student loans serviced

24  are reported to the credit reporting agencies. The court finds Koeut's concerns

25  regarding his credit score were a sound reason to reject the IBR. Since an IBR does not

26

---

27  [8] Koeut's testimony regarding what the employer stated was its reason for not hiring him
was partially stricken as hearsay. But other portions of his testimony to the same effect

28  were not, and the court finds the testimony in the record about Koeut's employment
challenges due to his credit score to be credible and corroborated by Bulman's testimony.

forgive the unpaid student loans balance for 25 years, Koeut would continue to carry

most of this debt loan for almost the remainder of his working life.

The DOE cited to *In re Frushour*, 433 F.3d 393, 402 (4th Cir. 2005), and other

cases in this Circuit as support for its claim that Koeut's abandonment of the IBR was

dispositive of bad faith. This Circuit, and even *Frushour*, *id.* at 402, recognize that a

debtor's acceptance of an IBR is not "dispositive" of good faith. *Hedlund v. Educ. Res.*

*Inst., Inc.*, 718 F.3d 848, 852 (9th Cir. 2013). The issue instead turns on the credible

evidence, which in this case is even more indicative of good faith than the facts in

*Hedlund, id.* at 853.

The debtor in *Hedlund* never even applied for an IBR. Koeut, in contrast, did

apply, consolidated his loans through an IBR according to the DOE, but then went into

default. Koeut, like the debtor in *Hedlund*, then faced collection activities. The IBR would

also have required Koeut to make minimal payments which he lacked the money to do

so and still meet his minimal living expenses. In *Hedlund,* the Ninth Circuit reversed the

district court and accepted the bankruptcy court's findings as not clearly erroneous that:

> Hedlund was justified in rejecting the three repayment options PHEAA had
> offered. The court stressed that the three options all had monthly payments over
> $300, which was more than Hedlund could afford without undue hardship. The
> court also noted that each option called for a thirty-year plan, and thus held that
> Hedlund was justified in refusing to obligate himself "into his mid-60s" when his
> children would likely be seeking to attend college.

*Id. See also Roth*, 490 B.R. at 917 (finding good faith where, during the time that the

debtor did not make payments, he did not have the "financial wherewithal to make

them."). *Hedlund*, 718 F.3d at 855-56 also distinguished *Birrane*, 287 B.R. at 499-500

because the debtor there made no effort to even research his eligibility for an IBR and

had maintained only part-time employment, thus failing to maximize her income. The

Ninth Circuit also distinguished *Mason*, 464 F.3d at 885, because Mason had also not

maximized employment or diligently applied for an IBR. Unlike the debtors in these

cases, Koeut has undertaken extensive efforts to maximize employment and only

17

1  rejected the IBR because he could not carry the burden of his student debt without

2  harming his opportunities for advancement. Koeut's reasons for rejecting the IBR were

3  sound.

4  **IV.    CONCLUSION**

5         Koeut has satisfied the tripartite analysis of the *Brunner* test sufficiently to

6  support a partial discharge of his student loans. Koeut's current income and expenses

7  do not support a minimal standard of living, even without making loan payments.

8  Koeut's inability to repay his full loan balance will persist over his remaining expected

9  working life to an extent that he can only make partial payments without enduring undue

10  hardship. As the DOE admits, Koeut deserves a break. A partial discharge of

11  $432,173.99 of Koeut's student loans will be ordered, leaving a balance of $8,291.67

12  with interest to accrue at .11%. Koeut will be required to make payments of $41.87 per

13  month to the DOE from December 2031 to December 2048.

14         It is hoped that this outcome will reverse Koeut's long run of bad luck and enable

15  him to become the productive member of society that he is willing and able to achieve.

16         Koeut is to prepare the judgment within 14 days of this opinion.

17         IT IS SO ORDERED.

18  Dated:  December 4, 2020

19

20                                               MARGARET M. MANN, CHIEF JUDGE
                                                 United States Bankruptcy Court

21

22

23

24

25

26

27

28